Heya my ladies, all dialed up to the max, we need a job done, we need a job done, we need a job done, we need a job done, we need a job done. It can be kind of categorized, I think, in probably four areas, the 12B6s on qualified immunity, as well as failure to supervise, and then the summary judgment with respect to conditions of confinement and the Americans with Disabilities Act. It's our contention, of course, that the district court erred in granting all of those and that there was an improper weighing of evidence in favor of the various defendants. So, starting with actually the conditions of confinement claim, because I believe that there is Fifth Circuit precedent that is directly on point with respect to that particular claim in the Montano v. Orange County case and the Sanchez v. Young County case. Particularly the Sanchez case, in which there was a woman that was intent on committing suicide, she ingested a bunch of drugs, and in that case she was actually assessed by EMTs and provided a medical review, and they claimed that she denied medical care. They took her to the jail. The jailers determined that she was intoxicated, so they started a medical screening, determined she couldn't answer the questions, discontinued the medical screening, put her in a cell where she died. That's very much on point with the facts in this case. Mr. Garcia, I know the court's aware there's a dispute as to whether or not any of the officers or jailers knew that he was a diabetic because of the bracelet he was wearing. But even giving them that, which, I mean, I don't think we should, but even giving them that, that they weren't aware, anyone who is intoxicated to the point where they can't walk, they can't talk, they can't answer questions, cannot simply be placed in a jail cell to either sober up or die. And I think that's what Montano and Sanchez both stand for, and they're both conditions of confinement claims because there was a practice, a pervasive practice, in both of those cases that was established of doing that, that obviously was not related to any legitimate government interest and resulted in the deaths of those two people. And it's very similar to this case where there was testimony by both Sheriff Rowe and Sergeant Cartwright that that was their normal procedure, that was typical. If somebody was unable, they were so intoxicated that they couldn't walk and they couldn't answer any questions, they would just put them in a detox cell and wait for them to sober up. And that was in direct contravention of their policies, which is, I think the case is even stronger than Montano or Sanchez because they didn't say that in those cases they violated written policies on a regular basis. But in this case, they acknowledge that Lubbock County contracted with WellPath, which was the medical provider, to ensure that there was medical care being provided, and WellPath required all persons, before they were ever even allowed to enter the jail, they would go into pre-receiving. And if in pre-receiving it was determined that they were so, for whatever reason, intoxicated, overdosed, medical condition, if they weren't able to function enough to answer questions or walk on their own, there had to be immediate contact to the medical department who would then potentially even not let them into the jail and direct the police officer who was in pre-receiving with them to take them to the hospital. And so that was a requirement between WellPath and Lubbock County, and Lubbock County acknowledges that its policies required them to act in that manner, and that they regularly just ignored their own policies, and if someone was unable to answer questions or go through the required medical screening, they just placed them in what they call the detox cell. Supposedly, under close watch, which they allege that occurred in this case, that they didn't notify medical at all, which they were supposed to do, and it was their practice not to, but they did tell a couple of the jailers to put them under close watch. As in Sanchez, there is substantial question in this case as to whether or not the jailers were lying about doing the close watch and whether they're covering up their failure to do it, because even after Mr. Garcia was found to be unresponsive in the cell and taken to the emergency room, they still kept noting that they were doing these close watches of him after he was no longer even in the jail. And then the Sanchez court found that deceit to support the claim that there was a cover-up, and that that supported the claim that the procedure that they were doing was pervasive. Otherwise, they wouldn't need to cover it up like they were doing. And in the Sanchez case, where they found it as a condition of confinement, the jailers who put the lady in the detox cell and ignored her were disciplined even for what they did. And in this case, Sheriff Rowe admitted he never even asked—he became aware of what happened, and he never even asked any of the officers involved, he never asked any of the jailers involved, he didn't ask his own supervisors why they deliberately chose to ignore the policies and take Mr. Garcia directly to the cell. He didn't ask the medical screener why she didn't do any of the medical screening. He didn't ask the officers who were responsible in pre-receiving for Mr. Garcia why they didn't contact medical. Nobody even questioned their normal routine practice of putting somebody who was unable to function into a cell without any medical screening whatsoever. I guess the district court's overview was this isn't a deliberate indifference case because every officer, every defendant involved, from the arresting officers to the intake officers, they may have been negligent, they may have been grossly negligent. They just diagnosed something that manifests similarly to something else. They thought that the fellow was drunk, and that's a grossly negligent thing because he's got bracelets on, Garcia. But how is that wanton disregard of a knownness when in fact what they've done is just made a miscalculation? Because that assessment is only related to his condition of diabetes. In other words, oops, we were wrong, we didn't know he was diabetic, and that's negligence. But what I'm saying is, and I think the case law supports both Thompson, if we're going to go talk about the deliberate indifference part, I think both Thompson and Dyer support the fact that they don't have to know what the underlying condition is. They don't have to know he's got diabetes. Usually the arresting officers say something and they ignore it, or the arrested individual says something and they ignore it. Or in the suicide cases, they're actually inflicting their own harm, they ignore it. Here, no one reads the bracelet. What they're ignoring are the signs of serious medical need. You can't assume someone ignored it because they just misdiagnosed it. They thought he was drunk. But even if he was drunk, let's assume for a minute, Your Honor, that he was drunk. Let's assume he had ingested drugs or consumed alcohol. Even under those conditions, if he's unable to function, that is a serious medical need. And I think the cases say you can't just say, okay, well, you're drunk, that's the reason why you can't walk or talk or answer questions, so we're going to let you sleep at all. That is no longer the law. I mean, I don't know if it ever was, but it isn't now. In the Thompson case, he was suffering from DTs as a result of alcohol consumption. And he was continuing to fall inside of the detox cell. Hit his head and put him in a straitjacket. But it was a condition that was associated with alcohol consumption. So what I'm saying is that even if he had been drunk, they still have to acknowledge a serious medical need because of the symptoms that he was exhibiting. Because he couldn't function. He couldn't talk. He couldn't walk. He couldn't remember his name. He couldn't remember where he lived. All of those things are signs and symptoms of all kinds of alcohol, drugs, medical conditions, whatever. And those cannot be ignored because they are signs of a serious medical need. And they were all trained that they were. And they ignored their own training. They ignored their own policies. They ignored their own procedures and just put him in a detox cell. Which also goes to the Climb Under the Americans with Disabilities Act, which is that it's sort of similar in that the ADA and the case law says that what they have to accommodate are the limitations, not the disability. So if they are aware of limitations, they have to accommodate those whether they know where they came from or not. And an example would be as in kind of in the Valentin case. If someone's in a wheelchair, you don't have to know why they're in a wheelchair. You don't have to know if they've got muscular dystrophy or whatever. All you have to know is that you can see they're in a wheelchair, and so you know that they need some accommodations for that. In a very similar fashion, they don't have to know that Mr. Garcia was a diabetic. All they have to know is that he can't walk, talk, or function or answer questions or remember who he is. And so that has to be addressed. It's not a failure to accommodate claim, but that has to be he can't be excluded from participating in some benefit. And the Valentin case says that that includes medical screening and medical care. So you can't assume that someone's limitation on functioning, like walking, talking, and remembering who they are, is because of an underlying condition, alcohol, and dismissive. You have to see those limitations, and you cannot use those to exclude them from medical care and screening. And so that puts this directly within the cases, such as the Valentin case and the Pena case, that state that if there is an open and obvious limitation on someone's functioning, you can't exclude them from the benefits, which include medical care and medical screening. With respect to the qualified immunity, the district court stated that we did provide evidence of a pattern of similar cases that occurred before Mr. Garcia's, but said that we didn't show that those had been adjudicated to be unconstitutional. And I don't think that that's the standard. We contend that the standard is that there has to be a pattern of cases where it was alleged to be unconstitutional, not that there had to be some adjudication of unconstitutionality, because if that was the case, it's a circular argument. You would say, well, there's never anything that's been adjudicated to be unconstitutional, therefore we're not going to hold this unconstitutional, which means that you would never have anything that would be adjudicated as unconstitutional. So there just has to be an allegation of pattern of unconstitutionality. And the plaintiff did plead that, and that aspect of it was the 12 v. 6. It was dismissed on the pleadings. So the plaintiff did sufficiently plead a pattern of alleged unconstitutional conduct. And I think there's plenty of evidence in the record that they should have known that Sheriff Rowe and Sergeant Hood knew from their own policies that what they were doing was wrong. There was clearly established law that it was unconstitutional to just take somebody and put them in a cell without getting a mini-medical screening, and yet they continued to adhere to that. They continued to say, hey, that's typical, that's common, that's what we do. And under those circumstances, that establishes the failure to supervise claim that Mr. Garcia asserted. With respect to the individual officers, there are three jailers, and then there's the medical screener as well as the arresting officers, all of whom either knew or should have known that there was clearly established law that prohibited them from delaying or denying medical care for a significant medical need. And we contend, of course, that they were all aware or should have been aware that he had a medical bracelet on, but even without that, that he was exhibiting signs and symptoms of a very serious medical need when they were all aware that he was unable to function, including the fact that when he was in the- In your 30 seconds, you're going to speak to the 28J citation of the Williams case. The Williams case, Your Honor? I think the Williams case is extremely distinguishable in this case from this matter. In the Williams case, the person in question that was being arrested actually got a medical screening, actually filled out a medical questionnaire, actually denied that he had a heart condition, which is what he ultimately passed from, and said that he didn't have any significant medical issues. So while he did exhibit some, like his back hurting and that kind of thing, he didn't indicate there was anything significant about it, and he got the medical screening that he was supposed to get. Thank you, Your Honor. Just out of curiosity, tell me exactly what his bracelet had on it. I mean, it looked different than typical sort of medical equipment. Right. It just said diabetic. Thank you. Thank you. All right. Mr. Mastin. Please support, counsel. I'm Matt Mastin on behalf of the Lubbock County athletes. It's our position that the trial court's judgment on both the 12B6 and the summary judgment should be affirmed. I want to step back for a minute and talk a little bit about the facts because they are important. As this court has said in other cases, facts matter. This incident happened in 2018. There was a call in about a suspected person at a grocery store that was under the influence. He'd been seen falling asleep. The evidence is that, contrary to some of the representations, Mr. Garcia was able to answer several questions of the officers. He was able to tell the officer where he lived, answer questions about how he arrived at the store, could not affirmatively provide his name, et cetera. He was taken in on suspicion of intoxication. When he gets to the jail, the officer does not report that he has any type of medical condition. He is reported as being uncooperative, and that's not because he was actively resisting, but they needed assistance getting out of the vehicle. He does come into the jail. He is escorted in. He is able, and this is very important, he is able to, in addition to these things that he'd already told the officers, he is able to answer questions whether he needs to be seen by medical. He answers no. But because they believe that, hey, he's intoxicated, they take him to a close observation cell. The record reflects that, and there's a difference in how you look at the facts, obviously, if it's a 12 v. 6 versus summary judgment. We had depositions taken after the individual or officer were dismissed, and in those depositions, it came out that no one saw any medical bracelets whatsoever. The plaintiff references the officer's video in the complaint, and so our position is that you can incorporate that by reference by looking in our brief. There's a still photo showing these bracelets. These bracelets are not the typical bracelets that you would expect for somebody that has a health condition. They're usually metal. These had nothing on them. Watch the video. There's nothing on there. They just look like silicone, but that's what the officers were seeing. When it got to the jail, there's nothing in the record that shows that there was anything showing that there were any bracelets whatsoever. So what you had, you had somebody that came in that mimicked the signs of being intoxicated, which is not unusual at all. What about this picture that we have of a blue bracelet? That's from the arresting officers. By the time he gets arrested until he gets to the jail, we don't know what happened to the bracelets. What we do know is that everyone that was deposed with the jail said they did not see any bracelets at all, and in fact, the property doesn't even list any bracelets. So the evidence before this court is that at the time he got to the jail, he wasn't wearing any bracelets. Was the allegation in the complaint about that? Do you remember what the allegation in the complaint was? Well, in the complaint, the allegation was that he had the bracelets on. Had them on. He didn't attribute cutting them off to any individual defendant. No, no, Your Honor. So if we look at the amended complaint and the Rule 7a reply, under those circumstances, the allegation was that he had the bracelets on, they were seen, and that he was cooperative. So the court addressed that on the Rule 12b-6, but then on the summary judgment, we had the ability to develop the record more, and so what you had was no one saw any of these. He was able to answer a question, and he's taken into the close observation cell, and he's monitored. One of the officers comes in, does a routine check, sees him laying on the floor snoring, tries to wake him up. He won't wake up. They call medical. Medical comes, and then he's taken to the hospital. And whatever relevance that there is, no one died in this situation. I'm not minimizing things, but this isn't a situation where somebody was left in a cell for four and a half days, not checked on. These facts are very, very distinguishable. The Sanchez v. Young case which was brought up, that one is also distinguishable on the facts alone, but it was also a case that came out after the events of this one. So we'd say that that one's not controlling from the standpoint of what the officers would have known or not have known at the time what the law was. Do you want to address the allegation about the checks occurring when he wasn't even in the cell? Okay, so the situation is that he was still logged in. When he was taken to the hospital, he was still logged in to the jail. And so there's multiple cells, and so when they're checked, those things are logged. And so even though he was at the hospital, he had not been discharged from the Lubbock County Jail, and that's why there would still be a notation of a check on there. Now, that's not something we got into very deeply in the case, but that's the practical answer to that. So there was not any fraud or anything like that. With respect to, you know, no discipline, well, Sheriff Rowe looked at it, and yes, everything in hindsight you can look at and say, you know, had they known, had they known this, maybe they would have done something different. But no, there was no discipline, and the facts of our case are so different from Montano, all these others, where there was just egregious things done where you had a supervisor say, you know, knew the person had a problem, said don't call an ambulance, you know, and the person deteriorated, and they still didn't do anything. We don't have any facts like that. What we have is we've got a situation where the person in our summary judgment record reflects this, that he had an extremely difficult to diagnose form of diabetes. It's called HHS. It's a smaller hyperglycemic state, and our expert, Dr. Biggs, said it's so rare that even first responders aren't trained to look for this. It's not taught. It's very, very difficult to diagnose, and ultimately that's what he had. He was verbal when he comes in. That's correct, Your Honor. Well, if he'd said to the intake officer, I'm not drunk, I have diabetes, different case? Different situation? Well, possibly, possibly. I guess what they're saying is those bracelets, at least as to the DI aspect of the case, they're saying the bracelets are equivalent to him having said to the officer. Right, but I think that you need some more facts for it to be a different case. Just because somebody's diabetic doesn't mean that they need to be close watched. It depends on the facts and circumstances. You know, we have, I don't know how many people there are in the world, in the U.S., that have diabetes, but it's becoming common. What's the case if someone says, I'm diabetic, I need my insulin, and instead they just put him in a room and deny him that medical care? Well, under those circumstances, I think we might have a different situation if they didn't call for medical to get his insulin. But what you have here, you've got a situation that the jailers didn't know what they were dealing with. They thought they were dealing with somebody that was intoxicated, and this court, you know, there's other cases from this court where they've upheld qualified immunity for jailers that simply miss it. You know, it's unfortunate, but you've got . . . The most on-point case in that body of law is what? I don't have this cited. You've cited several in the brief. I don't have this case cited to me. I've got another case that's unpublished. Well, it's not in the brief. Okay. Ms. Hutchinson did begin with the conditions of confinement argument, and that one is perhaps the most difficult. Is it correct that there was a policy of if perceived to be intoxicated, skip the medical screening? No. No, no, no. So what happened in this situation is their written policy wasn't followed. Their written policy was if somebody comes in and they're perceived to be intoxicated, they're supposed to have medical. But the sheriff's deposition testimony is that, in fact, there's a . . . even though it's a written policy that says that, in practice what it is is it depends on how the person presents. Because if the person is intoxicated but functional, then they're not . . . medical is not called. If they're intoxicated, they're slurring their speech. If they can't answer, it's a situational situation. In that situation, then medical was to be called. But what we have also . . . But all arrestees get a screen. Is that the argument? They all . . . They all get screened. The issue is just do we call medical? Do we call medical? And the thought was he was coherent enough to say he didn't need medical, but they put him in the close watch cell, we're going to follow up with more questions later. And then, unfortunately, we got to where we are. Your Honor, with respect to the individuals, there's two bases for affirming. One is no deliberate indifference. The other is qualified immunity. The trial court said that the law wasn't clear . . . A confused but compliant pretrial detainee had a right to properly seek medical care, simply, if you take the allegations as truths, simply on the basis of wearing medical bracelets. But I would submit to you that under all the facts, all the evidence, at least with respect to the summary judgment, and then on the pleadings, the trial court was correct in granting the dismissal of the individuals. But for those reasons, we request the court affirm. Two curiosity questions. One, so when he was handcuffed, nobody saw the bracelet or nobody knows what happened to the bracelet? Is there a dispute that he ever had one? There's no dispute that he had bracelets. In my brief, I have a screenshot of the bracelets. There's no wording, no words, lettering that are on the bracelets. You just say it's just a bracelet. It's just a bracelet. It's a silicone bracelet. Well, that's what I . . . Kids were wearing in high school, things like that. Well, that's what I saw, but at any rate, I thought I understood it. It said diabetic on it, and that's where I guess someone lost it. In the handcuffing house, didn't care, or somebody taking it off, et cetera. Okay. All right. Thank you. Thank you. All right. Is Wade . . . May it please the court. Tammy Wade for the arresting officers Mark Ellison and Joshua Conklin. And we are here asking the court to affirm the trial court's dismissal of the claims against both Officer Ellison and Officer Conklin based upon qualified immunity. A brief presentation of the facts involving the arresting officers. Cleaning show by Mr. Garcia that he was at United Supermarket, a grocery store in Lubbock, on the day in question. And at some point, the manager and store staff decided that they wanted him to leave. Lubbock police were called, and Officers Ellison and Conklin both arrived at the grocery store at about 1.30, pretty simultaneously. While Officer Ellison spoke with the manager to try to figure out what was going on Officer Conklin spoke with Mr. Garcia. And what's been alleged is that when they got there, Mr. Garcia was standing outside of the store, intermittently leaning on a railing, standing up, but he was answering questions. He was able to provide his name. The officers asked several times if there was somebody who could come and pick him up. He said there was not. They asked where he was living. They asked if he knew where he was. All of these questions were things that he answered. He pointed them to his vehicle. They tried to get his telephone to call somebody to come pick him up. They were unsuccessful in doing that. And based on what they had been told and their observations, they decided to take him in for public intoxication. Because at that point, he could not be left at the store, and he had not provided anybody's information to come and pick him up. Did they put the handcuffs on him at that point? They did handcuff him, yes, Your Honor. When they handcuffed him, the officers, when they were deposed after their claims had been dismissed, the officers do not dispute that he had these bracelets on. And the pleadings show that Mr. Garcia's testimony was that they did not say diabetic. They said diabetes, which I think is different, because if you see a bracelet that says diabetes, that could be a bracelet that you bought for $5 to support some diabetes foundation. If you see one that says diabetic, I think that's more indicative. So this bracelet by the pleadings said diabetes. The other one said cancer? The other one, I believe, said port. Port? P-O-R-T is, I believe, what the pleadings say, that that bracelet said to indicate that he had a chemotherapy port. And so you can't tell what these bracelets are. And the officers have never disputed that, yes, it shows in the video that he has these bracelets on. But the video also shows that they never read them. And their actions on that day indicate they believed that he was intoxicated. But they don't smell any alcohol or any of the other sort of initial features. He's got two bracelets on. One says diabetes and the other says port. But part of the Q&A was not, do you have any medical condition? Are you sick? I know you said they asked who could get him. I mean, the guy's in a grocery store as opposed to being in a bar. So the first thought is intoxication without even the smell of it? I mean, just the ‑‑ I know what you're saying. It says diabetes, but they never ask about or explore the possibility of a medical condition? That is correct, Your Honor. And I believe that the officers testified that sometimes with intoxicated persons, you don't have a smell of alcohol. That's one of the factors that you're to look at, but it's not despite. Yeah, no, no, I get that point. I guess I'm just, you know, at some point these bracelets disappeared. But seriously, I mean, once you said, well, they acknowledge he had them on, some kind of bracelet at the time of the handcuff, and at a minimum one says diabetes and the other says chemical port. I just think, like, that would at least trigger some instinct that there may be a medical issue of some sort, maybe not enough to carry the day, but just not take you totally down the alcohol trail. Well, and if you follow that line, Judge, I believe that at most that would be negligent. I'm following your argument. Based upon everything, Mr. Garcia was arrested and he was transported by Officer Ellison. Officer Conklin left the scene at 143, so he spent approximately 13 minutes with Mr. Garcia and had no further contact with him. Officer Ellison transported Mr. Garcia to the jail, which is a monitored facility where there is medical care, and he was booked into the jail, and from that point forward, Officer Ellison had no further contact with him. Did Officer Ellison say the bracelets were still on him when he was turned into the jail? He did not. He did not indicate the thought that the bracelets were still on Mr. Garcia when he filled out the inventory, and he does not recall what happened to the bracelets. They were not found in his vehicle. But he denied taking the bracelets off? He did. And he denied that the other officer that was with him, that he took the bracelets off? I don't think Officer Ellison was able to testify to that. Once the jail staff took him, and Officer Ellison couldn't recall if the bracelets were still on when he was escorted into the jail or not. Oh, he couldn't recall? I'm sorry? You say he couldn't recall. I thought you said earlier he said he didn't take them off. Well, they're not listed on the inventory that Officer Ellison completed. So at that point, his testimony was that he completed the inventory based on all of the property that he was given from the jail, and the bracelets are not listed on the inventory. So from that— What did he testify to? He assumed, based on his own inventory, he assumed that the bracelets were not on him when he took him into the jail. So he had no recollection? That's correct. And that's indicative, I think, of his state of mind, because if you're arresting somebody who you believe is intoxicated, two years later when you're given a deposition, you're probably not going to remember whether or not they were wearing silicone bracelets. If you recognize them as medical bracelets, then it may be more likely to stick in your recollection of the arrest. Based upon the case law and the precedent, we believe that the trial court properly granted qualified immunity to both officers. Even assuming that they recognized that these were medical alert bracelets, even assuming that they recognized that Mr. Garcia had diabetes, there is absolutely no allegation that they knew that he was going through a medical episode. And the video shows and the pleadings are even consistent with the fact that he was answering questions. Despite the claim now that he was incoherent, he was not. He spelled his last name. He told them where he was. He walked to the patrol car, and he was not what I would deem incoherent. He was able to answer some questions. Based upon that, the officers acted objectively reasonable under the clearly established law. The only cases cited by Mr. Garcia in support of their claims are Dyer and Thompson, which are distinguishable. Dyer was also—that opinion came down two years after this arrest, so I don't believe that it could create clearly established law. And Thompson is distinguishable for the same reasons that this court set forth in Williams v. Zachary, which we did our 28-J letter brief on. And for those reasons, we would ask that the trial court's order be affirmed as to both officers. Thank you. Thank you. Thank you, Ms. Smith. Your Honor, first of all, what Mr. Garcia was able to articulate at the time he was arrested did not include where he lived. And I would urge the court to review the specific video and the specific things that were listed by the plaintiff in our brief about what he was able to say and what he wasn't. He was not able to articulate where he lived. He was not able to articulate whether there was someone to come and get him. He didn't say, oh, there's nobody to come get me, but here's where I live. He wasn't able to answer those questions. Those officers spent, I think, somewhere under three minutes asking him questions. They put the handcuffs on the bracelets. You can look in the video, and they literally handcuffed the handcuffs on top of the bracelets. Those handcuffs were not removed until he was in the jail cell. They were removed by Jailer Martinez and then taken back and given to Officer Ellison in pre-receiving. So from the time that they put those handcuffs on him outside of the United Supermarket until he was in that jail cell, those handcuffs were never removed, and they were on top of the bracelets. The jail was supposed to get all of his jewelry and mark it on the property form. He had a lanyard around his neck that they took off and took back to Officer Ellison and had him fill out the property form including that. What happened to the bracelets that he still had on because they were underneath the handcuffs? When he was in the jail cell, nobody will admit to. So all they say is, we don't know, we haven't seen them, they're not on the property form. But they were the ones that were supposed to be listing them on the property form. Ellison does not, and again I encourage the court to review Officer Ellison's testimony. He does not say that he didn't think the bracelets were on there when he took them in or that he didn't know what happened or whatever. He says, we handcuffed him over them, I did not remove them, they were not in my police car, took him into the cell, and I got the handcuffs back, but nobody gave me the bracelets. With respect to the checks, the welfare checks or whatever, there is testimony that we have in the record, in the evidence, in our appellate brief, that when they do those checks, they have to actually scan the person. They do not scan the door, and there's evidence of that in the brief. So in order to do a welfare check, what they call a close watch check, you scan the person. And Mr. Garcia was not physically in the facility at the time they alleged that they scanned him to do the welfare check. Counsel stated that in practice, even though they have a policy that says everybody has to get medical screening, they don't do that if somebody has slurred speech, that type of thing. The evidence is replete with testimony that Mr. Garcia had slurred speech, that he wasn't able to walk, that he was incoherent, that he never refused medical care. At the very least, that's a fact issue in this case, he never, there's zero evidence that he refused medical care. In fact, the testimony of Ms. Maldonado, who's the medical screener, she says they never asked him. In the record, they have a form that has to be filled out. If someone refuses medical care, it has to be filled out and signed by the person refusing medical care. There is no such form for Mr. Garcia because he was never asked if he wanted medical care. The only alleged refusal was Sheriff Rose saying something like, well, I thought I read something that he had refused it. And one of the jailers saying, I think we asked him in the cell. But two of the other jailers said, no, he never said anything at all to us, ever, throughout the time we escorted him to the cell, until the time he was in the cell. So the very argument being made proves that they had a pervasive practice that denied people their constitutional rights. Because if they have slurred speech, if they're exhibiting signs that could be signs of medical distress or a serious medical condition, that's when they decide not to do the medical screening and take them directly to a cell. That's exactly what Montano and Sanchez say is a condition of confinement that is unconstitutional. So with respect to Mr. Garcia's ability to articulate, there is a lot of evidence in the record about that. And there is a lot of testimony from every single person that encountered him about that. And you can see, Your Honors, that when he was in the back of Officer Ellison's vehicle, he kept passing out and was unable to function at all. So for those reasons, we ask that the district court be reversed and the case remanded. Thank you. All right. Thank you, Judge Simpson. Thank you, Counsel Officer, for briefing and the oral argument case. The case will be submitted.